UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER HARPER, | ) | CASE NO. 1:16-cv-2972 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CITY OF CLEVELAND, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion for summary judgment filed by defendants City of Cleveland, Calvin D. Williams ("Williams"), and Michael McGrath ("McGrath") (collectively, the "City"). (Doc. No. 24 ["MSJ"].) Plaintiff Christopher Harper ("Harper") filed a memorandum in opposition (Doc. No. 27 ["Opp'n"]) and the City filed a reply (Doc. No. 29 ["Reply"]). For the reasons set forth herein, the motion for summary judgment is granted.

## I. BACKGROUND

### A. Harper's Complaint [1]

On December 12, 2016, Harper, an African-American and a former police officer for the City, filed his complaint against the three defendants (Doc. No. 1 ["Compl."] ¶ 2), generally raising claims of "retaliation for the exercise of free speech rights insured [sic] under the Constitution of

---

[1] Although, on summary judgment, it is not typical to cite to the pleadings, the record here is somewhat sparse. No one has submitted any deposition testimony. With its motion, the City has submitted affidavits of relevant persons, including supporting documentation, which is discussed *infra*. With his opposition, Harper has submitted only his own affidavit (although it is largely challenged by the City as inadmissible -- *see* Reply at 375-77). (All page number references herein are to the page identification number generated by the Court's electronic docketing system.) Harper has submitted nothing to refute the City's affidavits or its other competent evidence, instead devoting his opposition brief to a narrative argument with few pinpoint citations to the record, and, at one point, referencing three non-existent affidavits. (*See* Opp'n at 351 n.7.) Therefore, the Court finds it helpful to recite some of the allegations in the complaint, purely for purposes of factual context. That said, only evidence that meets the requirements of Fed. R. Civ. P. 56 has been considered for decisional purposes.

the United States," "retaliation for engaging in a constitutionally protected activity[,]" and "discriminat[ion] . . . on the basis of race in relation to discipline meted out[.]" (*Id.* ¶ 1.) Harper's claims are not set forth in separate counts, but are purportedly brought "under the Civil Rights Act of 1870, as amended, 42 U.S.C. § 1981, the Civil Rights Act of 1871, 42 U.S.C. § 1983, [and] Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)[.]" (*Id.* ¶ 6.)[2] According to Harper, the gravamen of his complaint is that "he was retaliated against and forced out of his position as a Cleveland police officer for engaging in a matter of public concern, organizing and speaking out for" himself and other City police officers who worked in a specialized unit at Cleveland Hopkins International Airport ("CHIA" or the "airport") (Opp'n at 347), and that he was discriminated against on the basis of race when "defendants did not treat non-black officers as harshly as the treatment afforded [him]." (*Id.* at 348.)

In particular, Harper alleges that, in 2007, he learned that the City was attempting to privatize the safety forces at CHIA. (Doc. No. 27-1, Affidavit of Christopher Harper ["Harper Aff."] ¶ 9.)[3] Harper claims that he organized 51 CHIA officers to fight this plan,[4] which he believed would place everyone in jeopardy because it would entail hiring officers for CHIA who would have no authority to arrest or detain. (*Id.* ¶¶ 11, 14.) Harper believes this "represented a serious matter of public concern[.]" (*Id.* ¶ 15.) Harper asserts that, due to his efforts, the plan was blocked. (*See generally* Compl. ¶¶ 12-19.) He further alleges that, as a result of his successful First

---

[2] All of these alleged "claims" are supported by a conglomeration of "facts" set forth in 92 paragraphs. (*Id.* ¶¶ 8-100.) No individual fact or set of facts is specifically linked to any particular claim and there has been no attempt to allege facts supporting the legal elements of any of the purported claims.

[3] As already noted, the City challenges most of Harper's affidavit as inadmissible.

[4] Despite Harper's assertion that he was responsible for leading this opposition, his response to defendants' interrogatory regarding the matter indicates only that the police union hired outside counsel "to assist the union in fighting for CPD jobs at CHIA[,]" and Harper "was the liaison between officers and legal counsel in the declaratory judgment lawsuit that sought to block the City from replacing police officers at the airport." (Doc. No. 24-6 at 327-28.)

Amendment activities to advance the public interest, instructions went out "to go after [him]"and, within months, he started "receiving unwarranted disciplinary allegations . . . and write-ups." (*Id.* ¶¶ 20, 29, 30.)[5] He claims that the City "formulated a plan to scrutinize [his] activities . . . in retaliation for his constitutionally protected activity with the view of discrediting him and punishing him [for] leading the effort to maintain police presence at [CHIA]." (*Id.* ¶ 35.) Ultimately, following formal disciplinary charges, a suspension, and a transfer from CHIA to the Fourth District (*id.* ¶¶ 82-93), Harper retired in April 2016 (Harper Aff. ¶ 37), an action he claims was forced upon him. (Compl. ¶ 94.)

**B.    The City's Evidence**

The City has submitted three affidavits. First, it submitted the affidavit of Fred Szabo ("Szabo"), currently the Assistant Director of CHIA (since January 2017), and formerly Commissioner of the Airport (from 2001 to January 2017) and Interim Director and Commissioner of the Airport (from 2015 to January 2017). (Doc. No. 24-2, Affidavit of Szabo ["Szabo Aff."] ¶ 1.) Second, the City submitted the affidavit of defendant McGrath, currently the Director of the Department of Public Safety (since February 2014), and formerly Chief of the Division of Police (from March 2005 to February 2014). (Doc. No. 24-4, Affidavit of McGrath ["McGrath Aff."] ¶ 1.) Finally, the City submitted the affidavit of defendant Williams, currently the Chief of the Division of Police (since February 2014), and formerly Deputy Chief of Field Operations for the

---

[5] Harper claims that, soon after he allegedly began to organize officers against privatization, on April 1, 2009, Sergeant Albert Reese started harassing him. Reese allegedly attacked Harper verbally during roll call, using obscenities and threatening that Harper would never work his shift again. (Doc. No. 24-6 at 320; Harper Aff. ¶ 26.) Although Harper claims that this was documented by four other officers in "Form-1 complaints," (Doc. No. 24-6 at 321), no copies are supplied in support of this assertion. Moreover, Harper does not allege that he was disciplined or suffered any adverse employment action in connection with this alleged one-time incident.

3

Division of Police (from 2011 to 2014). (Doc. No. 24-5, Affidavit of Williams ["Williams Aff."] ¶ 1.)

The City's Division of Police provides officers to CHIA, assigning officers there in the same manner as they are assigned to the five City police districts. (McGrath Aff. ¶ 3.) An officer's assignment to CHIA is subject to transfer/change at any time under the managerial rights of the City, as allowed by the collective bargaining agreement ("CBA").[6] (*Id.*)

Szabo attests that the City began to explore privatizing safety forces at CHIA in 2006, but there was never any intention to bring in private individuals without the power to arrest or detain. (Szabo Aff. ¶¶ 3, 4.) At the time, McGrath was Chief of Police, but he was not involved in the development of the idea of privatization. (McGrath Aff. ¶ 4.) Williams attests that, prior to his becoming Chief of Police, he was aware of efforts to privatize the safety forces at CHIA, but he had no first hand involvement or knowledge of those efforts, which had terminated by the time he became Chief. (Williams Aff. ¶ 3.)

Szabo and McGrath both attest that, until the filing of the complaint herein, they were never aware of any group of officers organizing or collectively expressing concerns about privatization, except for the police union (the Cleveland Police Patrolmen's Association [the "union"]) through its official representatives. (Szabo Aff. ¶ 5; *see* McGrath Aff. ¶ 5.) Szabo, McGrath and Williams all attest that they were not aware of any involvement by Harper in opposing privatization, either personally or through leadership of other officers, or through the union. (Szabo Aff. ¶ 6; McGrath

---

[6] A copy of the relevant CBA is attached to the affidavit of defendant Williams. (*See* Doc. No. 24-5 at 218-318.)

Aff. ¶ 7; Williams Aff. ¶ 4.) In any event, the efforts to privatize the airport safety forces ended in 2008. (Szabo Aff. ¶ 7; McGrath Aff. ¶ 6.)[7]

In mid-2013, approximately five (5) years after the privatization discussions ended (Williams Aff. ¶ 14), Szabo was made aware of citizen complaints of Harper sleeping in his vehicle while parked at the roadway at CHIA. Szabo passed this information on to the officer in charge. (Szabo Aff. ¶ 8.)[8] Szabo attests that, subsequently, Harper was observed inside the airport for prolonged periods, and Szabo became aware that Harper was abandoning his post and disappearing for hours at a time into a utility room containing HVAC equipment. Szabo and his security office decided to check the airport security cameras and Harper's swipe card records, which logged his entry through each doorway of the airport, including the utility room. (*Id.* ¶ 9.) This check of cameras and records verified that Harper was going frequently to the utility room, abandoning his post. (*Id.* ¶ 10.)[9] Szabo began to work with the police department's internal affairs unit and his security office to investigate this matter. They decided to utilize a pinhole camera in the utility room and, when viewing the resulting video footage, saw Harper sleeping in the room and even setting an alarm on his phone to wake himself up. (*Id.* ¶¶ 11, 12.) After this discovery, the matter was turned over to internal affairs and Szabo had no further involvement, other than to ultimately revoke Harper's airport security credentials on August 25, 2015. (*Id.* ¶ 14.)

---

[7] Harper asserts that the efforts ended in February 2009. (Harper Aff. ¶ 25.) Whether it was in 2008 or 2009 is not material to the legal determinations herein.

[8] Harper makes the unsupported assertions that the City first initiated retaliatory charges against him some time in 2012, after he allegedly "authorized the preparation of papers to seek an injunction[]" to prevent "mov[ing] [officers] off the roadway with traffic controllers . . . on the ground[,]" (Harper Aff. ¶¶ 28-31), and then "tried again in 2013 with the use of an 'anonymous' complaint which should have been barred by the collective bargaining agreement." (*Id.* ¶ 32.)

[9] Harper asserts that he "used the FIDS (Flight Information Display System) room . . . to prepare reports[.]" (Harper Aff. ¶ 34.) He also claims that he used the FIDS to "change when the weather was particularly cold" and "as a break room." (*Id.*)

5

Williams attests that in October 2014, while he was Chief of Police, his office "received a charging packet containing the internal investigation of Officer Harper's misconduct on duty in October 2014." (Williams Aff. ¶ 7.) Prior to that, he was unaware of any monitoring or investigation of Harper. (*Id.*) Williams reviewed the charging packet, recommended the charges, and forwarded the disciplinary information to McGrath for further proceedings under the CBA. (*Id.* ¶ 8.) According to Williams, a pre-disciplinary hearing was scheduled for December 3, 2014, but was rescheduled due to additional review, in particular, the need to investigate both whether Harper's supervisors had any culpability for failing to ensure he was performing his duties, and whether Harper's conduct rose to the level of criminality. (*Id.* ¶¶ 9-11.) Williams attests that it was standard practice to refer to the prosecutor's office for review any serious misbehavior with legal implications. (*Id.* ¶ 11.) The prosecutor declined to pursue criminal charges. (*Id.*)

McGrath attests that, on November 10, 2014, he sent Harper a charging letter based on numerous charges of sleeping on duty, being late for his shift, neglect of duty, and improperly filling out duty forms, among other things. (McGrath Aff. ¶ 12.) A copy of the charging letter is attached to McGrath's affidavit. (*See* Doc. No. 24-4 at 171-184.) Although the originally scheduled pre-disciplinary hearing was delayed due to the need for additional review, the charges against Harper were never dismissed pending that review. (McGrath Aff. ¶ 13.)

The rescheduled pre-disciplinary hearing was conducted on August 20, 2015 before Assistant Safety Director Tim Hennessy. (*Id.* ¶ 15.) During such proceedings, an employee may plead guilty, not guilty, or no contest. (*Id.* ¶ 16.) Under a pre-arranged agreement, at the hearing Harper entered a "no contest" plea to the disciplinary charges, in the presence of his union representative, the union attorney, and Harper's own attorney (who also represents him before this Court). (*Id.* ¶ 17.) Under that agreement, Harper received a 30-day suspension and would be

transferred from the airport. Harper never filed a grievance regarding either this disciplinary decision or the internal investigation that led to the charges. (*Id.*) Nor did he or his representatives ever challenge the timeliness of the charges or the disciplinary hearing. (*Id.*) In a letter dated August 21, 2015, a copy of which is attached to McGrath's affidavit (*see* Doc. No. 24-4 at 205-213), McGrath agreed to the 30-day suspension. (*See also* Doc. No. 24-7, Transcript of 8/20/15 Disciplinary Hearing.)

Following this discipline issued by McGrath, and after Szabo revoked Harper's airport security credentials, Williams transferred Harper from the airport to the Fourth District, under Williams' managerial authority within the CBA, and pursuant to the agreement reached when Harper entered his "no contest" plea to the charges. (Williams Aff. ¶ 16.) Harper did not file a grievance under the CBA regarding either the discipline or the transfer. (*Id.* ¶ 17.)

Although Harper now alleges that he was transferred to the Fourth District without any retraining,[10] causing him to go out on "stress leave" and never return (Harper Aff. ¶ 36), Williams attests that no retraining was necessary because Harper, as a CHIA officer, maintained the same level of annual in-service training as all other officers and was equally qualified as any other officer to work in the Fourth District. (Williams Aff. ¶¶ 18, 20.) In addition, although Harper was supposed to participate in a Return to Duty training program after his 30-day suspension and prior to going to work in the Fourth District, he appeared only for an initial intake and then called in sick for the remainder of the program until he retired. (*Id.* ¶ 19.)

---

[10] Harper never raised this issue prior to the filing of his complaint. (Williams Aff. ¶ 22.)

Williams attests that Harper's transfer from the airport to the Fourth District was a lateral transfer, without any demotion or decrease in salary or benefits. (*Id.* ¶ 21.) According to Williams, Harper retired on March 22, 2016. (*Id.* ¶ 28.)[11]

## II. DISCUSSION

**A.      Standard of Review**

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v.*

---

[11] Harper claims he retired in April 2016. (Harper Aff. ¶ 37.) The discrepancy is immaterial.

*Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992) (citation omitted). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*. (citation omitted).

**B.     Analysis**

Contrary to the requirements of Fed. R. Civ. P. 10(b), the complaint fails to set forth "each claim . . . in a separate count[,]" instead combining "jurisdiction and claims" into the following, single paragraph:

9

6. Jurisdiction of this action is conferred pursuant to 28 U.S.C. § 1331 and §§ 1343(3) and (4) for claims arising out of deprivation under color of state law of [sic] for violation of rights secured by the First Amendment to the Constitution of the United States, for violation of rights secured by both the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, pursuant to acts of Congress providing for equal rights of citizens, under the Civil Rights Act of 1870, as amended, 42 U.S.C. § 1981, the Civil Rights Act of 1871, 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f), and in accordance with a Notice of Suit Rights as required under Title VII which is appended to this complaint, incorporated by reference and identified as Exhibit 1, under the Ohio Civil Rights Act, Ohio Revised Code §§ 4112.01, *et seq.*, as amended, under a Consent Order captioned *United States of America v. City of Cleveland*, Case No. 1:15-cv-01046-SO and pursuant to 28 U.S.C. § 1367, jurisdiction is conferred for claims arising under state law.

(Compl. ¶ 6.) Vague and evasive pleading makes the Court's analysis more challenging because it allows for varying interpretations as to what is being advanced as Harper's specific "claims."[12]

In view of paragraph 6 quoted above, the Court construes the complaint as raising three counts: (1) race discrimination in employment and (2) denial of equal protection (disparate treatment), both brought under Title VII, 42 U.S.C. § 1981,[13] 42 U.S.C. § 1983, and Ohio Rev. Code § 4112.01, *et seq.*; and (3) First Amendment retaliation, brought under 42 U.S.C. § 1983.

---

[12] This may actually be a purposeful strategy intended to allow Harper to argue later (perhaps on appeal) that his complaint is being misconstrued and/or misunderstood. This strategy already appears to be at work in Harper's opposition brief, where he accuses the City of "devot[ing] little attention to the central issue of the case[,]" namely, "[d]efendants' retaliation for [his] speaking out on behalf of 51 officers[.]" (Opp'n at 348 and n.2.)

[13] Notably, however, there is no independent cause of action against a municipality under § 1981, *Arendale v. City of Memphis*, 519 F.3d 587, 599 (6th Cir. 2008) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)), because "'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units[.]'" *Arendale*, 519 F.3d at 598-99 (quoting *Jetts*, 491 U.S. at 733).

1. **Applicable Law**

a. **Claims of Race Discrimination and Denial of Equal Protection (Disparate Treatment) under Title VII, 42 U.S.C. § 1983, and Ohio Rev. Code Chapter 4112**

Title VII makes it "unlawful . . . for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Claims of racial discrimination brought under Title VII, § 1983, and Ohio Rev. Code Chapter 4112 are all analyzed under the same standards. *Thompson v. City of Lansing*, 410 F. App'x 922, 934 (6th Cir. 2011) (citing cases); *Graham v. Best Buy Stores, L.P.*, 298 F. App'x 487, 493 n.5 (6th Cir. 2008) (internal citations omitted). For all of these claims, when there is no direct evidence of discrimination, the Court applies the familiar *McDonnell Douglas/Burdine* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992).

Under this framework, Harper must first prove by a preponderance of the evidence a *prima facie* case of discrimination/disparate treatment. *Burdine*, 450 U.S. at 252-53. He does this by showing that: (1) he belongs to a protected class (here, a racial minority), (2) he was qualified for the job at issue, (3) he suffered an adverse employment action, and (4) he was replaced by a person outside the protected class. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 349 (6th Cir. 1997) (citing *Talley v. Bravo Pitino Rest., Ltd*., 61 F.3d 1241, 1246 (6th Cir.1995) (further citation omitted)). The fourth element may be met instead by a showing that plaintiff was treated differently from similarly-situated individuals. *Mitchell*, 964 F.2d at 582-83.

An adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (emphasis and citation omitted). Reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions. *Id.* at 885, 886; *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987). If a transfer or reassignment creates conditions that are objectively intolerable to a reasonable person, it may amount to a constructive discharge. *Kocsis*, 97 F.3d at 886. But, the employee's subjective comparison of the two positions is not relevant to the analysis. *Id.*

"[T]o make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects*." *Mitchell*, 964 F.2d at 583 (emphasis in original) (citation omitted).

If Harper makes out his *prima facie* case, the burden of production shifts to the City "'to articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802). Thereafter, the burden returns to Harper to show that the City's explanation is a pretext for discrimination. *Id.* He does this by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the City's] action, or (3) that they were insufficient to motivate [its] action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citation omitted). To carry that burden, Harper "must produce sufficient evidence from which a jury could reasonably reject [the City's] explanation of why it [disciplined him]." *Id.* (citations omitted).

### b. Claim of First Amendment Retaliation Under 42 U.S.C. § 1983[14]

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011) (quoting *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007)).

To establish a claim under 42 U.S.C. § 1983 for retaliatory termination from public employment in violation of the First Amendment,[15] a plaintiff must prove three elements: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (further citations omitted)). The first element is a question of law and, if it is not established, "no further inquiry is necessary." *Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir.1988) (citation omitted).

---

[14] Although employees are also protected from retaliation under Title VII (42 U.S.C. § 2000e-3(a)), there is no such claim here. First, the protection is only afforded to one who has opposed discriminatory employment practices, which is not the case here. Second, like all Title VII claims, a retaliation claim would had to have been exhausted administratively. Harper's EEOC charge alleges *only* race discrimination (disparate treatment), not retaliation. (*See* Doc. No. 24-8.) Although "courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge[,]" *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010) (citing *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006)), nothing in Harper's charge remotely alludes to retaliation for alleged protected activities.

[15] In his complaint, Harper mentions denial of due process under the Fourteenth Amendment as another ground for relief. (Compl. ¶ 6.) But he fails to set forth how he may have been deprived of life, liberty, or property without adequate procedural protections. Assuming he is asserting a property right in his employment at CHIA, Harper has not shown any deprivation of that right, much less inadequate process. The Court's independent review of the record reveals that it does not support any due process claim.

"[A] government employee retains the right to speak upon 'a matter of legitimate public concern' in which 'free and open debate is vital to informed decision-making by the electorate.'" *Naghtin v. Montague Fire Dist. Bd.*, 674 F. App'x 475, 478 (6th Cir. 2016) (quoting *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (further citations omitted)). Therefore, to determine whether a plaintiff's speech is protected under the First Amendment, this Court must apply the balancing test developed in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), weighing "the employee's interest in 'commenting upon matters of public concern'" against "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (quoting *Pickering*, 391 U.S. at 568) (further citations omitted).

If the plaintiff establishes a *prima facie* case, "the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (quoting *Dye*, 702 F.3d 294–95). Once the burden shifts, summary judgment is still appropriate "if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.*

### 2. Application of the Relevant Law to the Record

The City raises several arguments to challenge the various claims made by Harper. Each argument has some merit and could be individually addressed by the Court.[16] Harper's opposition

---

[16] The following are among the City's arguments. First, the City asserts that Harper's state law claims of discrimination and/or retaliation are barred because he failed to exhaust administrative remedies under the CBA. Second, the City points out that any federal retaliation claim has also not been exhausted, having not been included in the EEOC charge. Third, the City asserts that plaintiff cannot establish a violation of due process or, for that matter, deprivation of any property interest because his rights were governed by the terms of the CBA. Finally, the City argues that Harper's alleged "advocacy" efforts did not involve protected conduct.

makes no serious attempt to refute any of the City's arguments,[17] merely continuing his pattern of unsupported facts and conclusory statements of law, and ultimately summarizing his position on summary judgment as follows: "Unfortunately, each side is packed with their [sic] respective stories. Fortunately, the genuine issues of material fact soak the fabric of this case." (Opp'n at 363.)

Harper completely fails to address the components of the burden-shifting analysis, thereby avoiding what is fatal to his claims, namely, his inability to establish a *prima facie* case under any of his legal theories, as well as his inability to show that the City's well-articulated and well-supported legitimate, nondiscriminatory reasons for its disciplinary actions were not mere pretext for discrimination and/or retaliation.

Harper must show, as part of each of his *prima facie* cases, that he suffered an adverse employment action. He cannot meet this burden because his transfer from the airport to the Fourth District did not change any of the terms of his employment and was a reassignment that not only was permitted under the CBA (whether or not he had engaged in any "advocacy" efforts), but also was bargained for and agreed to by Harper himself when he entered into a no-contest plea to all the disciplinary charges against him, without raising the issues of discrimination/retaliation that he now raises, and without pursuing any grievances under the CBA. Further, Harper admits that he "retired" from the police force. He offers no evidence that conditions at the Fourth District were so unbearable that any reasonable person would have retired, *i.e.*, would have felt compelled to

---

[17] The exception is the argument relating to qualified immunity, which Harper specifically argues against. But, as discussed below, qualified immunity is not a relevant concept where, as here, Williams and McGrath are sued only in their official capacities.

leave. In fact, it appears that Harper never actually worked at the Fourth District after he was reassigned there, instead taking sick leave until he retired.

Nor has Harper come forward with any evidence in support of his allegations that he was disciplined, or was generally treated, differently than non-black officers. Harper claims, in conclusory fashion, that "[t]he discipline to which [he] was subjected was significantly more harsh than non-black officers [sic]." (Harper Aff. ¶ 41; *see also* Compl. ¶ 83 (white officers never tracked and followed); ¶ 84 (white officers not subjected to discipline after one-year mandatory period); ¶ 85 (no officer who led efforts to fight privatization has ever been monitored like him); ¶ 86 (no officer has been disciplined or punished similarly).[18]) But, notably, Harper neither points to any non-black officers who were accused of sleeping on the job or falsifying duty reports or leaving their posts for long periods of time, nor even denies that he himself engaged in those behaviors. Without officers comparable in every material respect,[19] Harper cannot meet his burden.[20]

---

[18] Harper's answers to interrogatories addressed to these allegations state that they are each asserted "on information and belief." (Doc. No. 24-6 at 323.) There is nothing in the record to suggest that the answers were ever supplemented with more particular information during or following discovery.

[19] The officers that Harper identifies in his answers to interrogatories are not even remotely comparable to him: Matthew Craska (involved in a fatal shooting on duty; whether he was disciplined is unknown); Christopher Randolph (involved in a beating; departmental charges were brought, but discipline is unknown); Paul Crawford (same as Randolph); Maggie Flores (charged for leaving her gun in a women's restroom stall, where it was found by a passenger and for damaging a city vehicle and blaming it on another officer; six-day suspensions for each); Robert Zubeck (leaving his duty post and traveling to his home in a city vehicle; two-day suspension); Jerry Tucker (leaving his duty post, traveling in a city vehicle, and damaging the vehicle in an accident; three-day suspension, but promoted to sergeant shortly after); John Browning (charged with theft for rearranging his hours to get more overtime; transferred); Margret Doran (charges of insubordination; no discipline); and Juan Dejesus (accused of violence in the workplace on two separate occasions; temporarily transferred for the first incident and a six-day suspension for the second, with only three days actually served). (Doc. No. 24-6 at 324-25.) One additional officer that Harper identifies -- Jeff Ryan -- was not disciplined after there were anonymous complaints that he publically criticized the mayor and made lewd comments about command staff. (*Id.* at 325.) Harper's disciplinary problems allegedly were initiated by an anonymous complaint. But that complaint was able to be confirmed through surveillance and checking his swipe card, whereas alleged verbal remarks made by the other officer would not have been able to be verified. As a result, what little similarity one might see between Harper and Ryan is insufficient to establish a disparate treatment claim.

[20] Moreover, were it not for one allegation in the complaint identifying Harper as "African-American," this record would be completely devoid of any hint of *racial* discrimination. The fact that allegedly "bad" things happen to a person who is African-American (or a woman, or disabled, or older, etc.), does not *prove* discrimination on the basis of that protected characteristic. *See E.E.O.C. v. Lucent Tech., Inc.*, 226 F. App'x 587, 591-92 (6th Cir. 2007) ("The

Equally fatal to Harper's *prima facie* cases is his inability to show any causal connection between his "advocacy" and the City's disciplinary actions. Both McGrath and Williams attest that they had no knowledge of Harper's activities aimed at resisting privatization of the CHIA safety forces; this is unrefuted by Harper. Moreover, even if the Court accepts as true Harper's assertion that his advocacy efforts continued through February 2009 (Harper Aff. ¶ 25), not 2008 as Szabo asserts (Szabo Aff. ¶ 7), there is insufficient temporal proximity between his actions and his ultimate discipline. *See, e.g., Parnell v. West*, No. 95-2131, 1997 WL 271751 at *2 (6th Cir. May 21, 1997) ("A causal link can be shown . . . through knowledge coupled with a closeness in time that creates an inference of causation.") (citations omitted); *see also e.g.*, *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that [plaintiff] was discharged four months after filing a discrimination claim is insufficient to support an [inference] of retaliation.") (citation omitted).

Even if Harper were able to establish a *prima facie* case under *any* of his legal theories, the City has more than sufficiently shown by competent and unrefuted evidence that it had legitimate, non-discriminatory reasons for its actions with respect to Harper, all of which were permitted under the terms of the CBA and agreed to by Harper. Harper has made no attempt to offer evidence that the City's articulated reasons for its actions "had no basis *in fact*, . . . did not *actually* motivate [the discipline] or . . . were *insufficient* to motivate [the discipline]." *Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 477 (6th Cir. 2012) (emphases in original) (citation omitted). Although it is clear that Harper views the situation differently than the City, he provides no evidence in support

---

mere fact that [plaintiff] was African-American is not enough to establish that he was someone targeted for termination. EEOC certainly cannot be arguing that [plaintiff's] race alone somehow permanently insulated him from ever being terminated, no matter how badly he might have performed." (footnote omitted)).

of his position. Even the bulk of his own affidavit constitutes no more than self-serving statements and legal conclusions that do not meet the requirements of Rule 56.

### 3. Individual Capacity vs. Official Capacity

Even though all of plaintiff's claims fail for the reasons set forth above, the City raises one additional argument that warrants the Court's specific attention.

Williams was, at all relevant times, the Chief of Police for the City. (Compl. ¶ 4.) McGrath was, at different times, either the Director of Public Safety or the former Chief of Police. (*Id.* ¶ 5.) The City argues that both of these defendants should be dismissed because they are sued only in their official capacities. (MSJ at 138, citing Compl. ¶¶ 4, 5.) In the alternative, and without conceding its position with respect to capacity, the City argues that these defendants are entitled to qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). (*Id.* at 138-39.)

Harper offers no opposition to the City's first argument. Instead he argues only that Williams and McGrath are not entitled to qualified immunity. (Opp'n at 359-61.) But qualified immunity is a defense that is relevant only in the context of an individual capacity suit, where the individual defendants have been placed on notice that they may be liable in damages; the defense need not even be considered if these defendants are sued only in their official capacities. *See Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 272 (6th Cir. 2015) ("qualified immunity only protects officials from damages liability in their individual capacities[]"); *United Pet Supply, Inc. v. City of Chattahooga, Tenn.*, 768 F.3d 464, 484 (6th Cir. 2014) (rejecting lower court's conclusion that qualified immunity is available as a defense in an official capacity suit) (citing *Ky. v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)).

In the Sixth Circuit, there is no per se rule that a plaintiff must affirmatively plead "individual capacity" in his complaint. *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (discussing *Wells v. Brown*, 891 F.2d 591 (6th Cir. 1989) and its progeny). But, "'absent *any* indication that these defendants are being sued individually, [the Court] must assume that they are being sued in their official capacities . . . .'" *Moore*, 272 F.3d at 772 (quoting *Whittington v. Milby*, 928 F.2d 188, 193 (6th Cir. 1991) (further citation omitted in original; emphasis added in original)). The Sixth Circuit "applie[s] a 'course of proceedings' test to determine whether § 1983 defendants have received notice of the plaintiff's intent to hold them personally liable[.]" *Moore*, 272 F.3d at 772. This test "considers such factors as the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability." *Id.* at 272 n.1 (citation omitted).[21]

Evasive pleading and briefing by Harper will not be rewarded. The burden was his to, first, formulate his complaint in a fashion that would give notice of an individual capacity suit, and, second (and importantly), to affirmatively oppose the City's argument that Williams and McGrath had been named only in their official capacities. Harper's failure to do so will not be overlooked at this stage of the proceedings, when all discovery is complete and there is nothing in the record

---

[21] Here, the course of proceedings is not particularly clear. Harper's prayer for relief includes a request for "appropriate personal and institutional compensatory damages, jointly and severally, against defendants[,]" as well as a request for "appropriate punitive damages, jointly and severally, against all defendants except defendant City of Cleveland[.]" (Compl. at 19-21 (Wherefore clause).) This seems to suggest individual capacity. In their answer to the complaint, the defendants collectively assert several defenses, including that they are "entitled to all other full and qualified immunities available under federal law or state law or both." (Doc. No. 5 (Answer) ¶ 104.) But they also asserted the following defense: "As a matter of law, the claims against Michael McGrath and Calvin Williams, in their respective 'official' capacity are claims against the City and do not separately exist." (*Id.* ¶ 111.) This suggests that McGrath and Williams did not perceive that they were being sued individually.

before the Court to suggest the requisite notice to Williams and McGrath.[22] Harper has effectively abandoned any intention to pursue Williams and McGrath individually. *See, e.g.*, *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when [he] fails to address it in response to a motion for summary judgment." (citations omitted)). Williams and McGrath are entitled to dismissal, and the same is granted.[23]

### III. CONCLUSION

For the reasons set forth herein, defendants Williams and McGrath are dismissed from the lawsuit, having been sued only in their official capacities, and summary judgment is granted in favor of defendant City of Cleveland.

**IT IS SO ORDERED**.

Dated: May 7, 2018

**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**

---

[22] For example, one might assume that a defendant sued individually would have been deposed during the course of discovery. There is nothing in the various status reports filed by the parties to suggest that depositions actually were taken. There is but one mention that the parties "will begin discussion regarding depositions." (Doc. No. 16 at 107.) But the next status report merely states that the parties engaged in paper discovery (Doc. No. 17 at 109), and that is followed by a status report stating that "[d]iscovery is closed." (Doc. No. 20 at 116.)

[23] The City does not argue that it cannot be liable under § 1983 on any theory of *respondeat superior*, but only for a constitutional violation that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). There are no such allegations here, providing an additional ground for granting judgment in favor of the City on any § 1983 claims.